IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BARBARA DAVIDSON,

                           Plaintiff,                 OPINION AND ORDER

    v.

MICHAEL J. ASTRUE,                            08-cv-209-bbc
Commissioner of Social Security,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Barbara Davidson appeals the denial of her application for Disability Insurance Benefits under Title II of the Social Security Act, codified at 42 U.S.C. §§ 416(i) and 423(d). Plaintiff alleged that she was exposed to toxic carpet fumes, resulting in "multiple chemical hypersensitivities" that cause her to experience cognitive and neurological problems upon exposure to even low levels of chemicals found in typical work environments. She also alleged that she could not work because of attention deficit hyperactivity disorder and migraine headaches. Although plaintiff's allegation of a disabling chemical sensitivity was supported by a handful of doctors, others found no evidence of a neurological impairment or toxic injury but attributed her symptoms to an anxiety disorder. The administrative law judge who denied plaintiff's application credited these latter opinions and

1

found that plaintiff's alleged chemical sensitivity was not a medically determinable impairment.  He found that although plaintiff's remaining impairments were severe, they would not prevent plaintiff from performing light work so long as she was not exposed to even moderate amounts of fumes, dusts, odors, gases or poor ventilation.  In his view, plaintiff was moderately limited in her ability to remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to  complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

Plaintiff contends that the decision of the administrative law judge is not supported by substantial evidence because he did not properly evaluate her mental functioning or her chemical sensitivity, did not properly assess her credibility and did not make a proper step five determination.  I find that the administrative law judge correctly evaluated plaintiff's mental limitations and chemical sensitivity and properly assessed her credibility.  However, he did not make a proper step five determination because he did not include all of plaintiff's mental limitations in his hypothetical question to the vocational expert.  Accordingly, I am remanding the administrative law judge's decision on this one ground and affirming it in all other respects.

The following facts are drawn from the administrative record (AR):

2

FACTS

A.  Background and Medical Evidence

Plaintiff was born on January 17, 1955.  AR 68.  She has a bachelor of arts degree in psychology and a master of science degree in education.  AR 130.  She has worked as a psychotherapist, school psychologist, play therapy graduate assistant and fitness instructor. AR 125.  Plaintiff was employed as a psychotherapist by the Midelfort Clinic in Eau Claire, Wisconsin from September 1993 until October 1994, when she was terminated.  Plaintiff has not worked since that time.  The last date on which plaintiff was covered by social security's disability insurance program was March 31, 1999, meaning that to be eligible for benefits, plaintiff had to show she was disabled on or before that date.  AR 25.

Plaintiff applied for disability insurance benefits more than four years later, in October 2003, alleging that she had been unable to work since October 13, 1994 because of a constellation of neurologic and physical symptoms that began when a new carpet was installed in her former workplace in late 1993.  She alleged that as a result of her exposure to the carpet fumes, she had developed "multiple chemical hyper-sensitivities" and intolerance to even low-level exposure to chemicals typically found in work, medical, social and transportation environments.  AR 171-72.  She also alleged that she suffered from toxic encephalopathy, sensory neuropathy, chronic rhinitis, chronic laryngitis, osteoporosis and attention deficit hyperactivity disorder.

3

Medical evidence before the administrative law judge at the time of the hearing included reports from several doctors who treated or evaluated plaintiff during the relevant time period.  Those reports are summarized below.

1. <u>Dr. Weggel</u>

Plaintiff was diagnosed with residual attention deficit hyperactivity disorder in 1992. In December 1993, plaintiff's psychiatrist, Dr. William Weggel, switched plaintiff's medication from Ritalin to Dexedrine, at a dosage of 10 milligrams four times a day.  When plaintiff returned to Weggel in February, he noted that she was doing very well on Dexedrine without side effects.  He reported that plaintiff was having a good response in terms of focus, persistence and concentration and had decreased impulsivity and hyperactivity.

2. <u>Dr. Bodeau</u>

In January 1994, after plaintiff began experiencing headaches, dizziness, tingling in her hands and memory loss that she attributed to the installation of the new carpeting, she was seen by Dr. Donald Bodeau, an occupational medicine specialist at the clinic.  Bodeau concluded that her symptoms suggested an organic vapor exposure related to the installation of the new carpet.  AR 217.

On February 4, 1994, Bodeau wrote to plaintiff's employer's insurance company, stating that plaintiff and two other employees were being evaluated for symptoms related to "sick building syndrome." (The term "sick building syndrome" is used to describe situations in which building occupants experience acute health and comfort effects that appear to be linked to time spent in a building, but no specific illness or cause can be identified. United States Environmental Protection Agency, Indoor Air Facts No. 4 (revised) "Sick Building Syndrome," available at http://epa.gov/iedweb00/pubs/sbs.html.) Investigation and testing of the building did not detect any significant levels of formaldehyde or naptha but found that the building was poorly ventilated.  AR 213-15.

On April 8, 1994, plaintiff returned to Bodeau, reporting continuing symptoms that had not improved even though she had moved her workspace into the basement of the building. Bodeau noted that plaintiff's multiple diffuse symptoms might be related to indoor air conditions in her work place, but he found "no compelling reason to restrict her working hours." AR 209. He concluded that plaintiff could continue working with no restrictions and return to see him in four to six weeks. AR 209, 212.

On August 31, 1994, plaintiff told Bodeau that her symptoms were getting worse. Bodeau ordered blood, urine, and immunologic testing. AR 209. The tests were uniformly normal, with the exception of a certain amount of hippuric acid identified in plaintiff's urine, possibly indicating some toluene exposure. Bodeau recommended that plaintiff continue

5

working without restrictions and have her blood checked for the presence of toluene at the end of her work shift. AR 206.  Plaintiff apparently did not keep her appointment to have her blood drawn and had no further visits with Bodeau.  Plaintiff was terminated from her job in October 1994 because of poor performance.

On July 9, 1997, Bodeau submitted a report to the state worker's compensation division stating that he had treated plaintiff from January 14, 1994 to September 28, 1994 for symptoms caused by the installation of carpet in her work area.  In Bodeau's opinion, the exposure had not resulted in any permanent disability and no further treatment was necessary.  AR 397-99.

3. Dr. O'Shields

Dr. William O'Shields was plaintiff's primary care physician from January 1994 through 1997.  He treated her for headaches, dizziness, forgetfulness, trouble with memory and sensitivity to inhalants.  AR 257.  In April 1994, O'Shields treated plaintiff for nasal congestion, headaches, sore throat and earaches.  In June and July 1994, O'Shields treated plaintiff for sore throat, ear pain and migraine headaches.  AR 251-56.  In October 1994, plaintiff saw O'Shields for headaches.  He prescribed Fiorinal and referred her to a toxicologist.  Plaintiff also reported left chest pain.  AR 250.  On December 14, 1994, plaintiff reported to O'Shields that she was feeling better after leaving her job.  AR 249.  In

6

1995 and 1996, O'Shields treated plaintiff for hand pain and migraine headaches.  AR 243, 245-46.  At plaintiff's request, in August 1996 O'Shields began prescribing Dexedrine to plaintiff for her attention deficit disorder.

4.  Dr. Heuser

In June 1997, plaintiff and her husband traveled to California so plaintiff could be evaluated by Dr. Gunnar Heuser, a self-styled neurologic allergist.  Over the course of a week, Heuser referred plaintiff to a number of other doctors for laboratory and other diagnostic  testing, including a current perception threshold study and magnetic resonance spectroscopy study.  From the studies, Heuser found evidence supporting a diagnosis of toxic encephalopathy and neuropathy as well as other evidence of "toxic injury."  Heuser was of the opinion that plaintiff's condition made her unable to tolerate even low level exposure to chemicals typically found in work environments, and therefore she was totally disabled. AR 290-99.

5.  Dr. Alessi

Heuser referred plaintiff to Dr. David M. Alessi, an otolaryngologist, in California. He examined plaintiff and took a biopsy from her middle nasal turbinate.  This biopsy showed that plaintiff had chronic rhinitis and squamous metaplasia.  Alessi diagnosed

7

plaintiff with chronic rhinitis, chemical sensitivity syndrome and chronic laryngitis.   He concluded that plaintiff was 100% disabled but could still perform her previous job duties if she were in a truly clean environment.  AR 270-272.

5. Dr. Nelson

On March 23, 1998, plaintiff saw Dr. Richard Nelson, a neurologist, in Billings, Montana.   Neurological examination revealed essentially normal findings, with plaintiff exhibiting good grip strength, reflexes, coordination and sensation.  AR 265.  From plaintiff's reports of problems with attention, concentration and memory following the new carpet installation, Nelson thought plaintiff might have a cognitive disorder possibly secondary to toxic exposure.  On March 24, 1998, Nelson performed "P-300 evoked potential studies" on plaintiff that showed a disturbance in her attention and concentration mechanism and possibly a disturbance in recent memory.   Nelson indicated that the abnormalities might be the result of amphetamines and that further neuropsychological testing would help provide clarification.  AR 263.  On May 7, 1998, Nelson examined plaintiff and found that her right hand grip was 2 kilograms and left hand grip was 1 kilogram.  She had blurred vision and numbness in her right middle finger.  AR 263.

On May 15, 1998, Nelson referred plaintiff to Dr. Samuel H. Mehr at the University of Nebraska explaining that plaintiff had a history of toxic exposure, primarily to

8

formaldehyde. He also said that plaintiff had some abnormalities discovered in a neuropsychological examination. AR 262. Mehr performed positron emission tomography scans on June 8 and June 9, 1998, which indicated that plaintiff had bilateral frontal abnormalities supporting the clinical diagnosis of attention deficit hyperactivity disorder and "significant global abnormalities of brain metabolism" that Mehr noted were typical of toxic encephalopathy. AR 266-67.

6. State agency consulting physicians

On December 22, 2004, a state agency consulting physician completed a physical residual functional capacity assessment for plaintiff as of March 31, 1999, her last insured date. He listed plaintiff's diagnoses as osteoporosis and chemical sensitivity. He found that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds and stand, walk or sit for about six hours in an eight-hour work day. He also stated that plaintiff should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. AR 351-57. Dr. Pat Chan, a state agency physician, affirmed this assessment on April 12, 2005. AR 357.

On April 13, 2005, state agency consulting psychologist Anthony J. Matkom completed a Psychiatric Review Technique Form for plaintiff, listing her impairments as adult attention deficit-hyperactive disorder and depression. AR 358-69. He found that plaintiff had mild difficulties in her activities of daily living and in maintaining social

9

functioning and moderate difficulties in maintaining concentration, persistence or pace.  He also noted that she had experienced no episodes of decompensation and there was no evidence that she met the "C" criteria.  AR 368-69.  Matkom completed a mental residual functional capacity assessment for plaintiff, finding that she was moderately limited in the following three areas: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; and completing a normal work day and work week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  AR 372-73.

## B.  Hearing Testimony

After the local disability agency denied her application initially and upon reconsideration, plaintiff requested a hearing, which was held on March 8, 2007 before Administrative Law Judge Larry Meuwissen in Eau Claire, Wisconsin.  AR 449.  Before the hearing, the administrative law judge denied plaintiff's request to appear at the hearing by phone.  In a letter dated March 6, 2007, plaintiff's lawyer advised the administrative law judge that she would not be appearing at the hearing because her prior experience in public places made her certain she would experience an acute exacerbation of her symptoms if she attended.  Counsel explained that plaintiff's husband had viewed the hearing site and noticed

10

that it had fabric covered chairs, vinyl wall covering, commercial carpet and dropped ceiling panels.

Plaintiff's husband appeared at the hearing and testified, accompanied by plaintiff's lawyer.  He said that plaintiff had a worker's compensation suit pending and that her personal injury suit against Carpet Land was "thrown out."  He testified that plaintiff had been evaluated by doctors in Minnesota in connection with that case.  The administrative law judge asked plaintiff's lawyer to try to obtain those reports.

Plaintiff's husband testified that they had traveled to California and Montana to see doctors and had stayed in motel rooms.  He called ahead to have the motel employees not use any air fresheners or chemicals and they opened the windows upon arrival to allow fresh air into the room.  AR 456.

Davidson also testified that they had three English Pointer dogs.  He testified that he hunts with them but when he works the dogs stay in the house with plaintiff.  AR 457-58.  Davidson testified that, while he is at work, plaintiff watches C-Span and uses the internet, does her own laundry and cleans when she feels well enough to clean.  AR 459.  He reported that in December 1999, plaintiff became dizzy from the smell of car exhaust and fell from a ladder when she was outside hanging Christmas lights.  AR 461.

11

The administrative law judge called Richard Willette, a neutral vocational expert, to testify.  AR 462.  He asked Willette to assume an individual of plaintiff's age, educational background, work experience and who had the following residual functional capacity:

> [E]ssentially a full range of light work on an exertional level, avoiding even moderate exposure to fumes, odors, dust, gases and poor ventilation; and limited to---with moderate abilities to maintain attention and concentration for extended periods and to carry out and remember detailed instructions, so basically, probably limited to three to four-step, routine, repetitive tasks.

AR 463.  Willette testified that such an individual would not be able to perform plaintiff's past work because of the exposure to the fumes and poor ventilation.  He testified, however, that such an individual would be able to perform jobs in a clean environment as an addresser (2,520 jobs in Wisconsin), office helper (2,570 jobs in Wisconsin) and information clerk (23,000 jobs in Wisconsin).  AR 463.  The administrative law judge asked Willette whether his testimony was consistent with the Dictionary of Occupational Titles.  He said that it was. AR 464.

### C.  Post-Hearing Evidence

After the hearing, plaintiff's lawyer submitted reports from two independent medical examiners who had evaluated plaintiff in connection with her worker's compensation claim. The first was Dr. Jack Shronts, an assistant professor of medicine at the University of Minnesota Medical School, who examined plaintiff on December 12, 1996.  In a report

12

dated February 4, 1997, Shronts wrote that plaintiff had reported experiencing symptoms of dizziness, headaches, nausea, vomiting and tingling in her fingers in connection with certain indoor environments and smells.  She reported having adverse reactions to gasoline, fresh paint, copying machines and particle board.  Plaintiff attributed the onset of her symptoms to the installation of new carpet at her former workplace in December 1993.

Shronts found nothing abnormal during his physical examination of plaintiff.  From his examination and a review of plaintiff's medical records, he concluded that plaintiff had multiple somatic complaints of a functional nature, a history of anxiety, adult attention deficit disorder and chronic migraine headaches.  AR 408.  He noted that plaintiff had never been found to have any occupational disease, no abnormalities had been found during physical examinations and blood testing for exposure to chemicals or end-organ damage had been negative.  He concluded as follows:

> Because Ms. Davidson's symptoms continue long after cessation of work in the Heike Building at the Midelfort Clinic (mid-October 1994), it is extremely unlikely that she has developed symptoms related to exposure in a "sick building."  In my opinion, Ms. Davidson's symptoms are probably resultant from ongoing anxiety and are quite possibly due to acute and chronic hyperventilation along with anxiety and fear attacks.  However, the exact nature of her symptoms has not to this date been explained.  Certainly investigation has been conducted for organic causation of symptoms and for the presence of organic disease but none has been found.

AR 409.  Shronts indicated that plaintiff had reached maximum medical improvement on January 1, 1995 and could return to work without any restrictions.  AR 409.

In a second report, dated September 8, 1997, Shronts reviewed additional evidence, including the reports from Heuser.  AR 400.  Shronts found nothing in the new reports that caused him to question his earlier conclusions about plaintiff's condition.  He indicated that Heuser's finding of "toxic injury" was another word for "multiple chemical sensitivities (MCS)" or "environmental illness,"which were terms utilized by physicians who termed themselves "clinical ecologists."  Shronts explained that the existence of environmental illness and the diagnostic methods used by clinical ecologists had no proven value and were not accepted in the mainstream medical community.  Shronts rejected the idea that plaintiff suffered from "multiple chemical sensitivities,"explaining that "MCS is not an organic disease entity and the concept for this purported disease lacks a proven scientific foundation."  AR 402.  He noted that although the Heike Building in which plaintiff worked might have had "sick building syndrome," there was no widely recognized objective proof that ongoing illness resulted from such work situations.  AR 402-403.

Counsel's post-hearing submissions also included an extensive report from Dr. Andrew Leemhuis, a neurologist and psychiatrist who had examined plaintiff on June 1, 1998 and reviewed her medical records.  According to Leemhuis's report, plaintiff was often uncooperative during the evaluation, refusing to provide Leemhuis with information about

14

the doctors she had seen and denying that she could remember certain information.  Plaintiff was vague about her daily activities, refusing to provide an estimate of when she typically went to bed at night or how often she cooked.  Leemhuis detected no abnormalities during his physical and neurological examinations, although he noted that many of plaintiff's responses were "functional or hysterical in nature."  AR 427.  He found that she had a good grip bilaterally and that her reflexes were normal.  AR 418-419.  Leemhuis observed that the results of plaintiff's performance on the Minnesota Multiphasic Personality Inventory test indicated that plaintiff had internal stress and tension that produced psychosomatic or psycho-physiologic symptoms.  Another psychological test, the Millon Clinical Mutitaxial Inventory, indicated that plaintiff had clinical syndrome (plaintiff's complaints did not take the form of distinct or isolated symptoms but appeared to reflect pervasive difficulties) and obsessive compulsive personality disorder with histrionic personality features and narcissistic personality features.  AR 410.  The interpretive report accompanying plaintiff's scores on the Millon inventory indicated that plaintiff was exhibiting psychological dysfunction of mild to moderate severity.  Short or long-term supportive therapy was recommended.  AR 438-45.

Leemhuis disagreed with Heuser that plaintiff had toxic encephalopathy.  He found no clinical findings to support Heuser's conclusions, pointing out various problems with the tests Heuser had administered.  He explained that the current perception threshold study was an experimental test performed by select laboratories in California and was generally not

15

accepted and the magnetic resonance spectroscopy test was inaccurate because the baseline was not constant.  He further noted that Heuser was not board-certified in neurology, immunology, toxicology or any field of medicine.  AR 429.

In Leemhuis's opinion, plaintiff's problems had no organic basis but were the result of psychiatric problems. He explained:

> From a psychiatric standpoint and also as seen in the psychological testing, this patient has a great deal of anxiety which is being converted to obvious tension, fears and phobias, and psychosomatic complaints.  Basically she has developed phobias concerning odors which trigger the anxiety within her system and in turn numerous psychiatric and neurologic disturbances.

AR 430.  Leemhuis attributed plaintiff's anxiety to her amphetamine use, which she had taken in large doses for at least five years for her attention deficit disorder.  According to Leemhuis,

> The anxiety disorder due to amphetamine dependence may produce prominent anxiety and panic attacks or obsessions and compulsions that predominate the clinical picture.  The disturbances cause clinically significant distress or impairment in social, occupational or other important areas of functioning.  Stressor may become a serious general medical condition.
>
> I do not believe that the patient has become allergically sensitized to odors but that the condition represents anxiety, stress, fears and phobias in an obsessive compulsive individual that may have attention deficit hyperactive disorder and has been now on large doses of Dexedrine for at least 5 years.  The good effects of the Dexedrine or stimulant have essentially disappeared and she is now in a dependency state.  This produces anxiety which in turn produces hyperventilation and causes many of the psychosomatic symptoms such as the numbness and tingling in the hands and feet.

16

AR 431.  He noted that there were other medications that could be used for attention deficit disorder and that "probably nothing is going to happen until she gets off the Dexedrine and in the hands of [a psychiatrist] who can understand the situation."  AR 431.

### D.  The Administrative Law Judge's Decision

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.  20 C.F.R. § 404.1520.  At step one, he found that plaintiff had not engaged in substantial gainful activity at any time relevant to his decision.  At step two, he found that, through her last insured date, plaintiff had several impairments that, in combination, were severe:  migraine headaches; osteoporosis; attention deficit-hyperactive disorder; an affective disorder with anxiety features; and an obsessive compulsive personality disorder with histrionic personality features and narcissistic personality features.  He did not find chemical sensitivity to be one of plaintiff's impairments, explaining that the evidence as a whole did not support the existence of that impairment.  AR 28.

The administrative law judge found at step three that plaintiff did not have a physical impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  AR 22.  Evaluating the functional limitations posed by plaintiff's mental impairments, the administrative law judge found that

plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, no episodes of decompensation and no presence of the "C" criteria on her last insured date. AR 28.

At step four, the administrative law judge determined that plaintiff had the residual functional capacity to perform light work limited to lifting 20 pounds occasionally and 10 pounds frequently; standing, sitting and walking for up to six hours in an eight-hour work day; with no exposure to even a moderate amount of fumes, odors, dusts, gases or poor ventilation; and with moderately limited ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  AR 28.  In reaching this conclusion, the administrative law judge acknowledged that there were a number of conflicting medical opinions and assessments regarding plaintiff's multitude of problems and symptoms dating back to the installation of new carpeting in her work area.  AR 34.  He stated as follows:

> The physicians and/or specialists that the claimant sought for the sole purpose of establishing an industrial disease and disability had offered opinions and assessments to such effects, and the physicians and or specialists that her prior employer and/or opposing counsels had sent her to have found no organic

causes for her multiple symptoms and complaints and therefore no work restrictions or limitations.

He also found that some of them had concluded that plaintiff's symptoms and complaints were the result of psychological conditions and dependency on Dexedrine. He decided, from "the pattern of objective evidence," to give substantial weight to the opinions and assessments of Bodeau, Shronts, Leemhuis and Millon and little weight to those of Heuser and Alessi. AR 30. He noted that plaintiff sought out Heuser for the sole purpose of establishing disability resulting from toxic chemical reactions rather than for treatment purposes. He reached this conclusion because Heuser submitted his opinion of plaintiff's total and permanent disability after seeing plaintiff only twice. The administrative law judge also noted that Heuser's opinion consisted of neurological diagnoses that should have been evaluated by a neurologist and that Heuser was not board certified in any field of medicine. AR 31. The administrative law judge placed no significant weight on Alessi's opinion because it was inconsistent with the record on or before March 31, 1999, Alessi did not make any treatment recommendation and his opinion was based on plaintiff's self-reports. AR 33.

The administrative law judge also gave significant weight to the state agency physician and psychologists' determination of plaintiff's functioning based on her osteoporosis, affective disorder and attention deficit hyperactivity disorder. He indicated that he was

19

adopting their assessments in reliance on all of the medical reports in the file and upon giving plaintiff "the benefit of all doubts with regard to her subjective complaints and symptoms." AR 35. He found that although plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. In this regard, he noted that plaintiff's allegations of incapacitating limitations were not consistent with the objective medical evidence, the conservative course of treatment or plaintiff's minimal use of medication and that her work and litigation history showed that plaintiff was not motivated to work.

Also, the administrative law judge considered the testimony of plaintiff's husband. He noted that Larry Davidson had testified that he hunted with three English pointer dogs, who lived in the house with plaintiff without any special precautions. He also noted that Davidson testified that his wife did the laundry and cleaned when she felt well enough to clean.

Relying on the testimony of the vocational expert, the administrative law judge found that plaintiff was not able to perform her past work but that there were jobs that existed in significant numbers in the national economy that she could perform, namely addresser and information clerk positions. The administrative law judge found that, pursuant to Social Security Ruling SSR 00-4p, the vocational expert's testimony was consistent with the

20

information contained in the Dictionary of Occupational Titles.  The administrative law judge found that plaintiff was not disabled from October 13, 1994, the alleged onset date, through March 31, 1999, the date last insured.  AR 38.

The administrative law judge made a number of secondary findings in the course of reaching his decision, some of which will be discussed below.


OPINION

A.  Standard of Review

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be.  Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless,

21

the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).

### B.  Refusal to Allow Plaintiff to Appear by Phone

Plaintiff argues that it was improper for the administrative law judge to deny her request to appear by telephone.  However, plaintiff cites no authority suggesting that claimants have the right to appear telephonically at administrative hearings.  To the contrary, the regulations make clear that a claimant may appear at the hearing in two ways: in person or by video teleconferencing.  20 C.F.R. §§ 416.1436, 416.1450.  Moreover, although plaintiff argues that appearing at the hearing would have come "at a high cost to her health" either in terms of chemical exposure or the anxiety from fear of that exposure, the record shows that she was able to attend medical appointments when necessary and to travel out of state for some of those appointments.  In light of this, it was reasonable for the administrative law judge to deny her request.

C. <u>Chemical Intolerance</u>

Plaintiff argues that the administrative law judge failed to properly evaluate her limitations when exposed to harmful chemicals. She contends that the administrative law judge improperly rejected the opinions of Heuser and Alessi, who believed that plaintiff suffered from chemical sensitivity syndrome. As an initial matter, plaintiff is simply incorrect when she suggests that the administrative law judge rejected the opinions of Heuser and Alessi solely because they were in conflict with that of the state agency physician. In fact, the administrative law judge rejected the state agency physician's opinion that plaintiff suffered from chemical sensitivity. Instead, the administrative law judge credited the opinions of Bodeau, Shronts and Leemhuis, all of whom concluded that plaintiff did not have "multiple chemical sensitivity" or any other impairment as a result of inhaling carpet fumes.

The administrative law judge had before him numerous medical assessments and opinions that diverged when it came to the cause and nature of plaintiff's symptoms. As he noted, the physicians split basically into two camps: those who endorsed "chemical sensitivity" as a medically determinable impairment and those who did not. Where, as here, the record before the administrative law judge contains conflicting medical opinions, this court must defer to the administrative law judge's resolution of that conflict so long as substantial evidence in the record supports his determination. <u>Hofslien v. Barnhart</u>, 439

F. 3d 375, 377 (7th Cir. 2006); <u>Young v. Barnhart</u>, 362 F.3d 995, 1001 (7th Cir. 2004). The administrative law judge explained that, because of "the pattern of objective evidence," as well as weaknesses in the reports of Heuser and Alessi, he was giving more weight to the opinions of Shronts, Leemhuis and Bodeau.  He explained that Heuser's opinion was suspect because Heuser was not board-certified in any medical specialty or a neurologist, but yet had offered neurological diagnoses.  The administrative law judge also noted that plaintiff sought out Heuser for the sole purpose of establishing disability resulting from toxic chemical reactions rather than for treatment purposes and that Heuser endorsed plaintiff's claim of total disability after only two visits.  In addition, he noted that no tests had shown plaintiff to be allergic to any specific chemical and no abnormalities had been found during physical or neurological examinations.  With respect to Alessi, the administrative law judge noted that his opinion was not consistent with the medical record and was based on plaintiff's self-reports; further, Alessi had not recommended any treatment for plaintiff's purported chronic ear, nose and throat problems.  All of these were good reasons, well supported by substantial evidence in the record, for deciding that the opinions of Shronts, Leemhuis and Bodeau were worthy of more weight and for concluding that plaintiff's "multiple chemical sensitivity" was not a medically determinable impairment.

24

D.  <u>Mental Impairments</u>

Tacking another tack, plaintiff contends that the administrative law judge failed to properly evaluate the mental impairments identified in Leemhuis's report.  The essence of plaintiff's argument is that even if she does not have a physical impairment that requires her to avoid exposure to all chemicals, she does have a mental impairment that produces the same limitations, namely, an anxiety disorder related to her use of prescribed amphetamines. Before addressing this issue, it is helpful to review the procedure the commissioner uses for evaluating mental impairments, which is set forth in 20 C.F.R. § 404.1420a.  First, the administrative law judge must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  If a medically determinable mental impairment exists, the administrative law judge then must rate the degree of functional limitation resulting from the impairment in four broad categories:  activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c).  The degree of functional loss in each category is important to identifying the severity of the impairment.  Claimants who are found to have "none" or "mild" functional loss are generally found not to have a severe mental impairment.  20 C.F.R. § 404.1520a(d)(1).  If the claimant has a severe mental impairment, then the administrative law judge must compare the degree of functional loss in each category to the listings to determine whether the claimant meets the criteria for a listed mental impairment.

25

20 C.F.R. § 404.1520a(d).  (In general, those who have "marked" functional loss in two or more categories will meet the criteria for a listed impairment.  See generally 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 (the listings for mental disorders).)  An administrative law judge need not complete a Psychiatric Review Technique Form showing his findings, but may document the findings in the decision.  20 C.F.R. § 404.1520a(e).

If the claimant has a severe mental impairment that does not meet the listings, then the administrative law judge must evaluate residual functional capacity by considering "an expanded list of work-related capacities that may be affected by mental disorders . . . ."  20 C.F.R. § 404.1520a(c)-(d); 20 C.F.R., Pt. 404, Subpt. P, App. 1, Rule 12.00A. (discussing steps for evaluating mental impairments).  The commissioner has ruled that"work-related mental activities generally required by competitive, remunerative work include the abilities to:  understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  Soc. Sec. Ruling 96-8p.  The Social Security Administration has a "Mental Residual Functional Capacity Assessment" form (SSA-4734-F4-SUP) that expands those categories into 20 more specific work-related functions that are to be rated.

In this case the administrative law judge found that plaintiff had the following medically-determinable mental impairments:  attention deficit hyperactivity disorder, an

26

affective disorder with anxiety features and an obsessive compulsive personality disorder with histrionic and narcissistic personality features.  Rating the degree of functional loss in the four broad areas of functioning, the administrative law judge found that plaintiff had mild limitations in her activities of daily living, mild limitations in social functioning, moderate limitations in concentration, persistence and pace and no episodes of decompensation.  As for plaintiff's mental residual functional capacity, he incorporated the following "moderate" limitations that Matkom, the state agency consulting psychologist, had checked off on the standard form:    ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal work day and work week without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods.

Plaintiff argues that Leemhuis's report supports more severe limitations than the administrative law judge found. Plaintiff points out that Leemhuis found that plaintiff suffered from an amphetamine-related anxiety disorder that "may produce prominent anxiety and panic attacks or obsessions and compulsions that predominate the clinical picture" and could "cause clinically significant distress or impairment in social occupational or other important areas of functioning."  (As plaintiff notes, Shronts had come to a similar opinion that plaintiff's various somatic complaints were the result of anxiety and fear attacks. However, Shronts was an internist and not a psychiatrist, and his report was less detailed

27

than Leemhuis's.  Accordingly, I focus on Leemhuis's report, as does plaintiff in her brief.) Recognizing that Leemhuis did not offer an opinion on plaintiff's degree of functional loss in either the four broad areas of functioning or the expanded list of mental work-related abilities, plaintiff argues that the administrative law judge should have developed the record further by having Leemhuis complete a mental residual functional capacity assessment, or in the alternative, ordering a consultative examination.

Because a hearing before an administrative law judge is not an adversary proceeding, the administrative law judge is responsible for ensuring that the record is fully and fairly developed as to issues that are material to the claimant's application.  Thompson v. Sullivan, 933 F.2d 581, 585 (7th Cir.1991).  This duty  may require the administrative law judge to obtain more information from the claimant's medical sources or consult medical advisors when the record appears to be incomplete.  Flener ex rel. Flener v. Barnhart, 361 F.3d 442, 449 (7th Cir. 2004); 20 C.F.R. § 404.1512(d).  However, the primary responsibility for producing medical evidence demonstrating the severity of her impairments remains with the claimant.  Id.; 20 C.F.R. § 404.1512(c).  Further, "because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected."  Id. (citing Luna v. Shalala, 22 F.3d 687, 692 (7th Cir. 1994)).  Finally, when an applicant for social security benefits is represented by counsel, the administrative law judge is "entitled to assume that the applicant

28

is making his strongest case for benefits," <u>Glenn v. Sec'y of Health and Human Services</u>, 814 F.2d 387, 392 (7th Cir. 1987), and to "require counsel to identify the issue or issues requiring further development."   <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167-68 (10th Cir. 1997).

Defendant argues that the record before the administrative law judge was complete because Matkom, the state agency psychologist whose findings the administrative law judge credited in his decision, had considered "all of the evidence of record, including the opinion of Dr. Leemhuis," when he rated plaintiff's functional limitations.   Mem. in Supp. of Comm.'s Dec., dkt. #7, at 16.   This statement is inaccurate.   Matkom could not have considered Leemhuis's report when he conducted his evaluation because the report was not entered into the record until after the hearing.   Thus, the record lacks any opinion from a medical professional regarding plaintiff's mental limitations that accounts for the findings made by Leemhuis.

Nonetheless, I am satisfied that the administrative law judge was under no obligation to develop the record further.   For one thing, plaintiff never alleged that she was disabled by an anxiety disorder, and neither her lawyer nor her husband made that claim on her behalf at the hearing.   The issue came to light only after the hearing, when, at the request of the administrative law judge, plaintiff's lawyer submitted copies of Shronts's and Leemhuis's reports.   In his letter accompanying the reports, plaintiff's lawyer proposed for the first time

29

that if the administrative law judge rejected plaintiff's claim that she was disabled by chemical sensitivity, he should find her disabled by the psychological impairments described by Leemhuis.  However, he did not request a consultative examination or suggest the need for more evidence.  The administrative law judge was entitled to rely on counsel's implicit assertion that the record was complete.  Further, it is unlikely that Leemhuis would have recalled enough information from his evaluation of plaintiff nine years earlier to have been able to complete a residual functional capacity assessment.  A consultative evaluation also would have been of limited value:  it would have revealed little information about plaintiff's functional limitations during the relevant time period from 1994 to 1999.  Having failed to file for benefits until four years after her insured status expired, failed to allege an anxiety disorder until after the hearing and failed to suggest that further development of the record was required, plaintiff is not in a strong position to complain that the record was incomplete.

For another thing, the administrative law judge is not *required* to consult a medical expert, but is permitted to do so if he concludes that the evidence before him is insufficient to make a determination.  <u>Skinner v. Astrue</u>, 478 F.3d 836, 844 (7th Cir. 2007); 20 C.F.R. § 404.1519a.  Contrary to plaintiff's suggestion, a medical source statement regarding the claimant's functional capacity is not necessary to a disability determination.  Although the administrative law judge is required to *consider* a statement by a medical source concerning the claimant's residual functional capacity, 20 C.F.R. § 404.1545(a)(3), and must

30

"ordinarily" request one from its consulting examiners, 20 C.F.R. § 404.1519n(c)(6), determining residual functional capacity is an administrative decision based upon all of the relevant evidence in the record, not just medical evidence.  20 C.F.R. § 404.1527(e)(2); Soc. Sec. Ruling 96-5p.  In this case, the record contained sufficient evidence from which the administrative law judge could determine plaintiff's mental functioning during the relevant time period:  plaintiff's reports of her activities on forms she submitted with her disability application; her husband's testimony; and Leemhuis's detailed report, which included his findings during a mental status exam, information about plaintiff's daily activities and the results of psychological testing, which showed that plaintiff was exhibiting mild to moderate symptoms.

The administrative law judge relied on all of this evidence in assessing plaintiff's functional limitations.  Although I agree with plaintiff that the path of his reasoning between the evidence and his assessment of plaintiff's residual functional capacity is not crystal clear, it is clear enough.  Notably, the administrative law judge provided the following discussion of plaintiff's mental limitations:

> Finally, in giving the claimant the benefit of every doubt, the undersigned finds that the mental impairments to which she is subject have resulted in mild limitations in activities of daily living, mild limitations in social functioning, moderate limitations in the  areas of concentration, persistence and pace, and no episodes of decompensation.  According to Mr. Davidson's testimony, they have own [sic] three English Pointers since 1980's and these pets have been restricted to one part of the house.  He does all of the cooking

31

and his wife does the laundry and cleaning when she feels up to it.  Mr. Davidson related that his wife watches C-Span, and spends time on the Internet during the day and doing some aerobic exercises.  They had traveled by car to Montana and California to consult with physicians.

An evaluation in June 1998 revealed that the claimant went to bed at variable times and when she got up, she had no schedule.  She cooked and shopped for groceries with her husband on occasion, and she might go to the video store to get a video. The evaluation showed that the claimant did drive and had a driver's license.   Upon mental status examination, the claimant was appropriately dressed and showed good hygiene.  She exhibited no abnormal psychomotor activity, and was attentive and made good eye contract.  The examination showed that the claimant's speech was good but she was quite tangential, circumstantial and had considerable loosening of associations.  She was also very vague, not cooperative, and would constantly say "I don't remember," "All of this is in the records and if you don't have it I'll send it to you."   The examination indicated the claimant displayed a good deal of studied noncooperation with exaggeration, and she denied being depressed but did show tension and some tendency to overreact to questions.  The claimant was oriented for time, place and person, and her IQ appeared to be in the high normal range.  (Exhibit 18F)  There was no indication that the claimant could not take care of herself, her living space or her dogs, manage her affairs or proceed with her personal injury, worker's compensation and social security disability claims, attend medical consultations, focus and concentrate on things, and get to places.  There was no evidence that the claimant could not get along with her husband, family and friends, or participate and engage in family gatherings and social events.  Finally, the evidence did not establish the presence of the "C" criteria required in the assessment of an affective disorder on or prior to March 31, 1999.  Accordingly, after considering all relevant factors, the undersigned finds that the weight of the record supports a conclusion that from October 13, 1994, the alleged disability onset date, through March 31, 1999, the date last insured, the claimant had retained the residual functional capacity for a range of work identified above.

AR 37.

Admittedly, the administrative law judge made these findings when rating the degree of plaintiff's functional limitations in the four broad categories of functioning, which is not identical to the residual functional capacity assessment, which requires "a more detailed assessment by itemizing various functions contained in the broad categories." 20 C.F.R. § 404.1520a; Soc. Sec. Ruling 96-8p.   Nonetheless, the evidence considered under both inquiries overlaps significantly.   Id.   I am satisfied that in assessing plaintiff's mental functional capacity, the administrative law judge did not rely merely on Matkom's opinion but considered the record as a whole, including Leemhuis's report.  It is plain that he found nothing in Leemhuis's report to suggest more severe limitations than Matkom found when he completed his review.

Plaintiff has not challenged any of the findings or proposed any mental limitations that the administrative law judge failed to include in his residual functional capacity assessment.  Apart from arguing that the record was insufficient to permit a determination of plaintiff's residual functional capacity, the only specific criticism plaintiff levels at the administrative law judge's mental residual functional capacity assessment is that he failed to properly account for her need to remain homebound because of her fear of being exposed to chemical irritants, which she argues is corroborated by Leemhuis's finding of an anxiety disorder.  (Of course, the only way for the administrative law judge to have "accommodated" this limitation would have been to find plaintiff completely disabled.)  However, it is plain

33

from the administrative law judge's decision that he did not find plaintiff's alleged need for this limitation to be credible, no matter what the cause.  In particular, he noted that plaintiff told Leemhuis that she occasionally shopped with her husband or went to the video store, that she had traveled to California and Montana to consult with physicians, and that plaintiff and her husband had three English Pointers that lived inside the home.  The administrative law judge noted that although plaintiff's husband testified that they did not use insecticides on the dogs and restricted them to one part of the home, plaintiff's husband used the dogs for hunting "where they might well be exposed to all sorts of agricultural chemicals, pollens and animal spoors" and the dogs returned to the home after such outings without any special precautions.  AR 30.  Also, the administrative law judge found that plaintiff's allegations had to be "viewed with caution" because the evidence showed that plaintiff was "no longer motivated to work."  AR 36.  In this regard, he noted that plaintiff had not attempted to return to or look for work after her termination in October 1994 but instead had spent her energy pursuing a personal injury suit, a workers compensation claim and social security disability.  Id.

In general, an administrative law judge's credibility determination will be upheld unless it is "patently wrong."  Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006); Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006).  A credibility determination is not patently wrong if the administrative law judge gives specific reasons that are supported by

34

the record.  <u>Skarbeck v. Barnhart</u>, 390 F. 3d 500, 505 (7th Cir. 2004).  The administrative

law judge's credibility finding in this case passes that standard.  Plaintiff argues that it was

not proper for the administrative law judge to find her incredible on the basis of her ability

to leave home, arguing that she did so only to seek needed medical treatment.  However, the

evidence refutes this assertion.  Plaintiff told Leemhuis that she occasionally went to the

grocery store or the video store.  Further, as the administrative law judge observed, neither

Heuser or Nelson, the doctors in California and Montana, provided plaintiff with any

treatment but rather were sought out by plaintiff "for the sole purpose of establishing an

industrial disease" caused by her exposure to carpet fumes.  Overall, the record supports the

administrative law judge's conclusion that plaintiff was able to leave her home when she

wanted to.  Further, the administrative law judge reasonably accommodated plaintiff's fear

of exposure to chemicals, to the extent it was supported by the record, when he found that

she could not perform jobs requiring exposure to even a moderate amount of fumes, odors,

dusts, gases or poor ventilation and that she would have moderate limitations in certain areas

related to concentration, persistence and pace.

Finally, I do not understand the point plaintiff is making when she argues that the

administrative law judge ignored the evidence of her "amphetamine-like disorder."  Leemhuis

found that plaintiff had an "anxiety disorder due to amphetamine dependence."  The

35

administrative law judge noted this fact and considered Leemhuis's report in assessing plaintiff's functional limitations.

In sum, substantial evidence supports the administrative law judge's conclusion that plaintiff's mental impairments imposed at most moderate limitations in her ability to perform tasks requiring concentration, persistence and pace and that her allegations of a complete inability to leave her home were not credible.  Further, because the record before the administrative law judge contained enough evidence from which the administrative law judge could evaluate plaintiff's mental functioning during the relevant time period, he had no obligation to obtain additional evidence on that subject.

E.  Step Five

Plaintiff argues that the administrative law judge's determination that plaintiff is able to perform a significant number of jobs in the national economy is not supported by substantial evidence because it rested upon the vocational expert's answer to a hypothetical question that failed to incorporate all of plaintiff's limitations.  Young v. Barnhart, 362 F.3d 995, 1003 (7th Cir. 2004) (hypothetical question to vocational expert must include all limitations supported by medical evidence in record).  First, plaintiff argues that the administrative law judge ignored the evidence showing that plaintiff has limited use of her hands.  As support for this limitation, plaintiff points out that Nelson noted during his

36

second visit with plaintiff that she had decreased grip strength and that Leemhuis indicated that plaintiff's reports of numbness and tingling could be the result of her amphetamine use. However, Leemhuis found that plaintiff had good grip bilaterally and there is no evidence of injury to plaintiff's hands.  Plaintiff is able to use the computer and hang Christmas tree lights.  Substantial evidence supports the administrative law judge's determination that plaintiff's use of her hands was not limited by her medically determinable impairments.

More persuasive is plaintiff's contention that the hypothetical was incomplete because it failed to include plaintiff's moderate limitation on the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." In response to this argument, defendant states that there is no evidence to support plaintiff's contention that she has such limitations, but defendant is incorrect:  state agency psychologist Matkom and the administrative law judge both found that plaintiff has such limitations.  However, the administrative law judge did not ask the vocational expert to consider these limitations when considering whether there were jobs in the national economy that plaintiff could perform.

This omission may very well have been harmless because of the way the administrative law judge phrased his hypothetical question.  Although the administrative law judge began by asking the vocational expert to assume a hypothetical person with moderate

37

abilities to maintain attention and concentration for extended periods and to carry out and remember detailed instructions, he concluded his question by asking the vocational expert to consider an individual who was "limited to three to four-step, routine, repetitive tasks." In other words, the administrative law judge attempted to translate plaintiff's mental limitations into the types of jobs plaintiff could perform. As this court has noted in the past, although courts have occasionally been critical of hypothetical questions phrased in this manner, case law thus far indicates that "an administrative law judge is free to formulate his mental residual functional capacity assessment in terms such as 'able to perform simple, routine, repetitive work' so long as the record adequately supports that conclusion." Kusilek v. Barnhart, 2005 WL 567816, *4 (W.D. Wis. 2005) (citing cases), *aff'd,* 175 Fed. Appx. 68 (7th Cir. 2006) (nonprecedential disposition). See also Craft v. Astrue, 539 F.3d 668, 677 (7th Cir. 2008) (comparing residual functional capacity for "unskilled" work, which provided no information about claimant's mental condition or abilities, with capacity for "repetitive, low-stress work," which reflected some work requirements that were relevant to mental abilities). An argument could be made that, by limiting plaintiff to three-to-four step, routine, repetitive tasks, the administrative law judge reasonably accounted for all of plaintiff's moderate limitations, including her moderate limitations in persistence and pace. But the commissioner has not attempted to make this argument or suggested that the administrative law judge's omission was harmless. Accordingly, because it is not clear that

38

the administrative law judge's hypothetical question accounted for all the mental limitations that were supported by the record and that he included in his own residual functional capacity assessment, this case must be remanded to the commissioner to make a new step five finding.

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff Barbara Davidson's application for disability insurance benefits is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) on the sole ground that the step five finding is not supported by substantial evidence. The decision is affirmed in all other respects. The clerk of court is directed to enter judgment in favor of plaintiff and close this case.

Entered this 6th day of November, 2008.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge